[No. G033151. Fourth Dist., Div. Three. May 10, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JACOB GABRIEL FLORES, Defendant and Appellant.

## Opinion

**MOORE, J.**—Julio Valdivia and Tony Morales were shot to death during a gang brawl outside a bar. A jury found defendant Jacob Gabriel Flores guilty of first degree murder of Valdivia, as charged in count one of the information, found it to be true he committed count one for the benefit of, at the direction of, or in association with a criminal street gang, and personally discharged a firearm causing death during the commission of the murder. The jury found defendant not guilty of murder and voluntary manslaughter of Morales, but guilty of conspiracy to commit a battery of Morales, a lesser offense. Defendant was found guilty of street terrorism, as charged in count three of the information, and of carrying a firearm while he was an active participant in a criminal street gang, as charged in count four. The jury also found it true that defendant committed count four for the benefit of, at the direction of, or in association with a criminal street gang.

The court erroneously modified CALJIC No. 17.19.5 to omit reference to the accomplice limitation contained in Penal Code section 12022.53, subdivision (d). (All further statutory references are to the Penal Code unless otherwise noted.) We reverse the 25 years to life sentence imposed for the enhancement prescribed by section 12022.53, subdivision (d).

Under section 1385, a court has the power to dismiss or strike an enhancement. The court was not authorized to stay punishment for the gang enhancements to counts one and four.

Because defendant could not have committed count four without necessarily committing count three at the same time, we further conclude the court erred by not vacating the conviction on count three.

In all other respects, the judgment is affirmed.

I

FACTS

Sergeant Lorenzo Carrillo, assigned to the homicide unit of the Santa Ana Police Department's gang detail, was assigned to investigate the shooting deaths of Tony Morales and Julio Valdivia. Carrillo arrived at the scene in front of El Tapatio restaurant in Santa Ana about 4:20 a.m. on March 31, 2001. The exterior of the restaurant wall had graffiti spray painted on it: "Troubles, little troubles, ESSA" with a large "E" at the bottom.

The establishment had been busy that night. About 300 people were there. Manuel Salvador Lopez, a patron at El Tapatio during the evening of March 30 and the early hours of March 31, heard defendant arguing with Tony Morales, "a guy from Santa Nita," and told defendant to relax. Lopez heard the gang names of F-Troop, Santa Nita, Fifth Street, Diablos and Eastside called out. He saw gang signs being thrown up in the air. About 1:45 a.m., there was a last call for alcohol.

After Lopez had his last beer, he was approached by Julio Valdivia as he headed toward his parked car. While Lopez and Valdivia were conversing, defendant came up to them, and Valdivia gave defendant an automatic firearm. Shortly thereafter, Lopez heard someone yell out "Santa Nita" as well as a disrespectful comment about other gangs. When Lopez turned around, he "saw Julio and another gentleman fighting."

Lopez heard shots. He saw two hooded men were shooting. Then, from his other side, Lopez saw defendant start shooting too. Lopez observed defendant shoot Valdivia. Defendant then put the gun in his waistband and ran.

Denise Renteria was also at El Tapatio the same night. She saw defendant run toward the fight "with his hand inside of his Pendleton" jacket. When she was asked what she saw next, Renteria said, "I didn't. I just saw everybody fighting, and then I heard gunshots and everybody running away from where everybody was fighting, and I just saw two bodies laying there."

Another El Tapatio patron, Sylvia Mendez, planned to drive Morales home. The two left El Tapatio together that night. She heard someone shout a profane remark about the Santa Nita gang. "I just remember turning around and seeing a lot of people fighting and I remember [Morales] fighting with this guy. [¶] . . . [¶] There was a lot of people fighting. It was kind of like a bar brawl." Mendez did not see who shot Morales. She said a man wearing a Pendleton made a "certain movement" that looked as though he had a gun in his hand. She saw a flash of light from something in the man's hand. It was when she saw the flash of light that she saw a look of pain on Morales's face. It was at that point the man in the Pendleton ran toward the street.

Rene Orejel belongs to the Eastside gang. He said defendant is also a member of Eastside. After Orejel got home, he received a call from defendant, who was crying. Orejel asked what happened, and defendant kept repeating he had erred.

Valdivia's cousin, Francisco Lemus, said he and Valdivia went to El Tapatio together, arriving at approximately 11:30 p.m. He observed defendant throwing Eastside gang signs. Later he saw Valdivia on the ground by the handicapped parking space fighting. Valdivia was straddling another man. "He was kneeling, and the guy was lying." Then Lemus heard six or seven gunshots. Lemus looked back and saw the shooter was wearing a plaid shirt. He saw defendant run away. Lemus said defendant was the one who fired the gun.

Santa Ana Police Officer Ernesto Gomez has investigated over 100 gang crimes over 11 years, including murders, attempted murders, shooting into an occupied houses and cars and possession of firearms. He testified that defendant denied being at El Tapatio "on March 30th going into the early morning hours of March 31, 2001."

Gomez testified that Eastside was originally part of a larger gang called F-Troop which came into existence in the early 1970's. In the early 1990's various F-Troop factions began splitting off from F-Troop itself. He said currently there are the Southside F-Troop, the Highland F-Troop and the Eastside F-Troop gangs. Gomez explained that "ESSA" means "Eastside Santa Ana." He said that as of March 30, 2001, the primary activities of the Eastside gang were "murder, attempted murder, shooting into occupied vehicles, gang members in possession of handguns and some of them were involved in narcotic trafficking." Gomez said that, based upon his documentation and tattoos, defendant is a member of the Eastside gang. He said Valdivia was also a member of Eastside.

A jury found defendant guilty of first degree murder of Valdivia as charged in count one, and determined he committed the murder for the benefit of a gang and personally discharged a firearm. He was found not guilty of the murder of Morales, but guilty of conspiracy to commit battery as a lesser offense, of street terrorism and of carrying a loaded firearm while an active participant in a criminal street gang. The jury also determined he carried the firearm for the benefit of the gang.

The court sentenced defendant to prison for an indeterminate term of 50 years to life on count one, 25 years to life for murder and 25 years to life for personal use of a gun. On the remaining counts, the sentence was ordered to be served concurrently with the sentence on count one.

On appeal, defendant raises numerous issues, ranging from instructional to sentencing errors. He argues that portions of his conviction must be reversed and that the matter must be remanded to the trial court.

## II

## DISCUSSION

*Section 12022.53, subdivision (d)*

Defendant argues the judgment against him must be modified to strike the 25 years to life enhancement to the term imposed on count one. He contends the court incorrectly modified CALJIC No. 17.19.5 to omit the requirement that he must have inflicted great bodily injury upon a person "other than an accomplice." He reasons the evidence supported the murder conviction principally under the doctrine of transferred intent. Since Valdivia was an

accomplice to the target crime, but could not be an accomplice to his own murder, defendant nevertheless is entitled to the benefit of the accomplice exception where the murder is the natural and probable consequence of the crime to which he was an accomplice. To avoid rendering the accomplice exception mere surplusage, we agree.

■ As of the date of Valdivia's murder, March 31, 2001, the firearm enhancement provided: "Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a), . . . and who in the commission of that felony intentionally and personally discharged a firearm and proximately caused . . . death[] to any person *other than an accomplice*, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony." (Italics added.) The Legislature apparently decided that killing one's accomplice is less blameworthy (or at least less deserving of punishment) than killing a nonaccomplice. The wisdom of this choice is debatable, but that is not our concern. The interpretation of the accomplice exception is also debatable, and that is our concern.

The Attorney General concedes the court erred when it failed to include the words "other than an accomplice" when it instructed the jury on the firearm enhancement using CALJIC No. 17.19.5. But the Attorney General argues that the error was harmless because, as a matter of law, one cannot be an accomplice to one's own murder.

■ The evidence adduced at trial supports a finding that defendant shot at Morales, who at the time was fighting with Valdivia, but hit Valdivia. Had defendant's shot hit only Morales or Morales and some other person, Valdivia would surely have been charged as a coconspirator and an aider and abettor of defendant's crimes, i.e., an accomplice. (See *People v. Garceau* (1993) 6 Cal.4th 140, 183 [24 Cal.Rptr.2d 664, 862 P.2d 664] ["accomplice" is a person who either aids and abets defendant's crime or is a coconspirator harboring the intent to commit the offense that was the object of the conspiracy].)

In the instant case defendant's shot killed Valdivia, a person who, until that very moment, had conspired with and had aided and abetted all of defendant's conduct. The Attorney General nevertheless argues the accomplice exception to the firearm enhancement does not apply, and defendant is subject to the same 25 years to life prison term as he would have been in the case of

a third party killing. The Attorney General's argument reasons that as a matter of law an "accomplice" is chargeable with the same offense as the defendant who is being tried. (See § 1111; *People v. Verlinde* (2000) 100 Cal.App.4th 1146, 1158 [123 Cal.Rptr.2d 322].) Thus, the argument concludes, since one cannot be charged as an accomplice to one's own murder, the accomplice exception to the firearm enhancement does not apply when the accomplice is the murder victim. To state the conclusion in that fashion is to demonstrate its error.

■ If the Attorney General's argument were accepted, the accomplice exception to the firearm enhancement would be meaningless. The exception would *never* apply under any circumstance. The exception obviously *does* not apply where a nonaccomplice is the victim. A defendant who intentionally and personally discharges a weapon in the course of committing one of the enumerated crimes that proximately results in the death of *any* person would *always* have the sentence enhanced by an additional prison term of 25 years to life. The Attorney General would write the exception out of the statute. "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage. [Citation.]" (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1].)

■ We avoid writing the words out of the statute by recognizing that the exception in the enhancement must be attached to the intended, not the charged crime. If the victim is an accomplice to the crime he or she and defendant intended but ends up the victim of one of the enumerated offenses, the exception in section 12022.53, subdivision (d) applies.

■ Thus, when determining whether the accomplice exception applies to count one in the instant case, and to avoid writing the exception out of the statute, the relevant question must be whether Valdivia was an accomplice to the intended crime, the natural and probable consequence of which was the intentional discharge of a firearm resulting in his own death. Here, the jury found defendant guilty of a conspiracy to commit a battery on Morales. "Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 93, pp. 310–311; see also *People v. Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861].)

There was sufficient evidence from which the jury could have found Valdivia was defendant's coconspirator, and that a natural and probable consequence of the conspiracy to commit a battery on Morales was the firing

of the gun which killed Valdivia. Valdivia's status as a coconspirator to commit a battery on Morales would make him defendant's accomplice to *that* crime, which resulted in his own murder.

When the court struck the words "other than an accomplice" from CALJIC No. 17.19.5, it withdrew from the jury the opportunity to consider whether Valdivia was an accomplice to defendant's discharge of the firearm either as an aider and abettor or as a coconspirator. If Valdivia was such an accomplice, the accomplice exception must apply to give meaning to the statute, and defendant should not have been sentenced to the additional 25 years to life prison term. This error cannot be considered harmless under both *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] and *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. The imposition of the 25 years to life consecutive prison term imposed pursuant to section 12022.53, subdivision (d) must be stricken.

*Uncharged conspiracy*

Defendant was convicted of conspiracy to batter Morales as a lesser crime of the crime charged in count two, the murder of Morales. He next contends the trial court erred when it did not specify in its instructions to the jury the particular overt act or acts in furtherance of the conspiracy.

Defendant maintains that were this court to find at least one overt act, the judgment on count two cannot be affirmed because he "had the right to be informed of the lesser included offense charged against him and to be given an opportunity to prepare to meet that charge." For this proposition, he cites *Feagles v. Superior Court* (1970) 11 Cal.App.3d 735, 739–740 [90 Cal.Rptr. 197], wherein the court explained the reason for requiring a charging document to allege specific overt acts is to satisfy the due process requirement that a defendant have adequate notice of the charge against him. Because the instant case does not involve a charge of conspiracy, we do not view *Feagles* as helpful.

■ Defendant's argument, made without the support of authority, is unpersuasive. He asks that we extend the law to require the trial court to identify specific overt acts in furtherance of a conspiracy, even when it is an uncharged crime. The California Constitution requires the trial court to instruct on every element of an offense. (*People v. Flood* (1998) 18 Cal.4th 470, 480 [76 Cal.Rptr.2d 180, 957 P.2d 869].) The trial court informed the jury there must be proof of an agreement between two or more persons with the specific intent to agree to commit a battery as well as the commission of

at least one overt act in furtherance of the agreement to find a defendant guilty of conspiracy. The court's instruction satisfied its sua sponte duty to instruct.

*Counts three and four*

Defendant next contends his conviction on count three must be reversed because it is a necessarily included offense of count four. The Attorney General concedes defendant is correct. We agree and accept this concession.

■ The California Supreme Court has recently said the reason for the rule prohibiting conviction on a necessarily included offense (rather than simply barring multiple punishment) is *not clear.* "[D]espite the seemingly absolute language of section 954 ('the defendant may be convicted of any number of the offenses charged'), there is an exception to the general rule permitting multiple convictions. 'Although the reason for the rule is unclear, this court has long held that multiple convictions may *not* be based on necessarily included offenses. [Citations.]' [Citation.] ' "The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense." [Citations.]' [Citations.]" (*People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48].)

Defendant was convicted of street terrorism, in violation of section 186.22, subdivision (a) as charged in count three of the information and of carrying a firearm while he was an active participant in a criminal street gang, in violation of section 12031, subdivision (a)(2)(C) as charged in count four. He could not have committed count four without necessarily committing count three at the same time. He cannot be convicted of both crimes. Accordingly, we reverse his conviction on count three.

*Punishment for count two*

Defendant argues that, since he was punished for murdering Valdivia, as charged in count one, his punishment for conspiring to batter Morales, a crime less than the murder of Morales which was charged in count two, should be stayed under section 654. His reasoning is that the murder of Valdivia was committed while performing acts in furtherance of the conspiracy.

■ The purpose of section 654 is to ensure that punishment will be commensurate with a defendant's culpability. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211 [23 Cal.Rptr.2d 144, 858 P.2d 611].) The Supreme Court

explained: "A fortiori it would violate [section 654] to sentence a defendant for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes. If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense. [Citation.]" (*In re Cruz* (1966) 64 Cal.2d 178, 180–181 [49 Cal.Rptr. 289, 410 P.2d 825].) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not more than one." (*People v. Neal* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]; see *People v. Cleveland* (2001) 87 Cal.App.4th 263, 267 [104 Cal.Rptr.2d 641].)

In the instant case, the conspiracy was to batter Morales. There was no evidence of a conspiracy to murder Valdivia. Defendant was not punished twice for the same crime. Section 654 does not bar his punishment on count two.

*Punishment for count four*

Defendant next argues that punishment for both his conviction on count four for carrying a loaded firearm while he was an active participant in a criminal street gang in violation of section 12031, subdivision (a)(2)(C) and punishment for the enhancement to count one, personally using a firearm during its commission within the meaning of section 12022.53, subdivision (d) violates section 654. He says he carried the firearm for only a brief period before committing count one and it was one continuous course of conduct. As a consequence, he argues this court must correct the judgment to stay the term for count four.

Some decisions have held section 654 does not apply to enhancements because they relate to the penalty to be imposed, but do not define a crime or offense. (*People v. Boerner* (1981) 120 Cal.App.3d 506, 511 [174 Cal.Rptr. 629]; see also *People v. Rodriguez* (1988) 206 Cal.App.3d 517, 519 [253 Cal.Rptr. 633].) Other decisions have held section 654 does apply to enhancements because the statute "proscribes multiple punishment for the same act." (*People v. Moringlane* (1982) 127 Cal.App.3d 811, 817–818 [179 Cal.Rptr. 726], disapproved on another point in *People v. Jones* (1991) 53 Cal.3d 1115, 1144–1145 [282 Cal.Rptr. 465, 811 P.2d 757].) While recognizing this split of authority, the Supreme Court has not yet resolved it, but suggested the

applicability of section 654 depends on the enhancement at issue in *People v. Coronado* (1995) 12 Cal.4th 145 [48 Cal.Rptr.2d 77, 906 P.2d 1232]. In *Coronado*, the court held that section 654 did not bar the use of a single felony drunk driving conviction to both elevate the defendant's later drunk driving conviction to a felony under Vehicle Code section 23175 and enhance his sentence under section 667.5. (*Coronado,* at p. 158.)

In *People v. Arndt* (1999) 76 Cal.App.4th 387 [90 Cal.Rptr.2d 415], the court held that section 654 did not preclude imposition of punishment on more than one sentence enhancement for injuries to multiple victims by the same act. But the court found the trial court erred when it imposed punishment for more than one enhancement for injuries to the same victim. (76 Cal.App.4th at pp. 396–397.)

■ As stated above, conduct evidencing different intents constitutes separate and divisible acts within the meaning of section 654 and is subject to multiple punishment even if the crimes share common acts or were parts of an otherwise indivisible course of conduct. Whether conduct is divisible depends on the intent and objective of the actor. (*People v. Cleveland, supra,* 87 Cal.App.4th 263, 267.)

The cases cited by defendant in support of his argument are quite different from the immediate facts. In *People v. Bradford* (1976) 17 Cal.3d 8 [130 Cal.Rptr. 129, 549 P.2d 1225], a defendant was convicted of being a felon in possession of a firearm as well as assault with a firearm upon a peace officer. While driving a car, he had been stopped by a highway patrolman, got out of his car, wrested the patrolman's gun from him and fired several rounds at him. The court held punishment for both offenses was barred by section 654 because the felon's possession of the patrolman's gun was not separate from his use of it on the patrolman. (17 Cal.3d at pp. 13, 22.) Similarly, in *People v. Kane* (1985) 165 Cal.App.3d 480 [211 Cal.Rptr. 628], a defendant's convictions of assault with a firearm and discharging a firearm from an occupied vehicle were not divisible. (*Id.* at p. 488.) The same type of situation occurred in both *People v. Cruz* (1978) 83 Cal.App.3d 308 [147 Cal.Rptr. 740] and *People v. Venegas* (1970) 10 Cal.App.3d 814 [89 Cal.Rptr. 103], wherein defendants were convicted and sentenced for both assault with a firearm and being a felon in possession of a firearm, acts which were indivisible under the facts of the cases. (*People v. Cruz, supra,* 83 Cal.App.3d 308, 333; *People v. Venegas, supra,* 10 Cal.App.3d 814, 821.)

The instant case demonstrates separate acts and intents. Defendant and Valdivia conspired to batter Morales. Defendant took a firearm from Valdivia

and put it in his waistband as part of the conspiracy. Then two hooded men fired shots. At that point, defendant began shooting too. This evidence supports the conclusion that defendant decided to use deadly force himself only after others had raised the level of force. Accordingly, even if defendant's carrying the gun and his use of it could be considered part of a continuous course of conduct, the unique facts of this case demonstrate that defendant harbored separate and consecutive intents.

We conclude, as did the trial court, defendant's intent and conduct of personally using a firearm to murder Valdivia are divisible from his intent and conduct of carrying a firearm while he was an active participant of a criminal street gang. Accordingly, section 654 does not preclude the trial court's separately punishing for each. We decline to stay sentence on count four.

*Gang enhancements on counts one and four*

Defendant contends the trial court was not authorized to stay punishment on enhancements on counts one and four and that remand is necessary. The jury found it to be true that defendant committed counts one and four for the benefit of, at the direction of, or in the association with a criminal street gang in violation of section 186.22, subdivision (b)(1). The trial court stayed punishment on each.

 " 'A stay is a temporary suspension of a procedure in a case until the happening of a defined contingency. [¶] In contrast, a striking is an unconditional deletion of the legal efficacy of the stricken allegation or fact for purposes of a specific proceeding. It is tantamount to a dismissal. In particular, the striking of an enhancement implies that the enhancement is legally insupportable, and must be dismissed in furtherance of justice.' [Citation.]" (*People v. Carrillo* (2001) 87 Cal.App.4th 1416, 1421 [105 Cal.Rptr.2d 360], fn. omitted.)

 "Under section 1385 a trial court has the power to dismiss or strike an enhancement." (*People v. Rivas* (2004) 119 Cal.App.4th 565, 571 [14 Cal.Rptr.3d 611].) "The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction for the first time on appeal. [Citations.]" (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391 [75 Cal.Rptr.2d 244].) Moreover, as to count one, the California Supreme Court has now held the enhancement in section 186.22, subdivision (b)(1)(C) may not be imposed on an underlying life term. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1007 [22 Cal.Rptr.3d 869, 103 P.3d 270].)

## III

## DISPOSITION

The matter is remanded for the court to strike the enhancement under section 12022.53, subdivision (d) on count one, vacate the conviction as to count three and exercise its discretion to resentence defendant in light of this opinion. In all other respects, the judgment is affirmed.

Sills, P. J., and Ikola, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 2005. Werdegar, J., did not participate therein.